## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**KEY OPERATING AND
PRODUCTION COMPANY, L.L.C.**

**CIVIL DOCKET NO. 6:21-CV-03555**

**VERSUS**

**JUDGE DAVID C. JOSEPH**

**WHITE CAPITAL GROUP, LLC,
ET AL**

**MAGISTRATE JUDGE DAVID J.
AYO**

## MEMORANDUM RULING

Before the Court are two motions: (i) a MOTION FOR PARTIAL SUMMARY JUDGMENT filed by Defendants, White Capital Group, LLC ("White Capital") and Energy Equities, Incorporated of Texas ("EEI") (collectively "Defendants); and (ii) a MOTION FOR PARTIAL SUMMARY JUDGMENT filed by Plaintiff, Key Operating and Production Company, L.L.C. ("Key Operating") (collectively, the "Motions"). [Docs. 66, 68]. For the reasons which follow, the Court DENIES Defendants' MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 66] and GRANTS IN PART and DENIES IN PART Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT. [Doc. 68].

## FACTUAL BACKGROUND

This case involves a joint venture among several companies to finance the drilling of an oil well in Plaquemines Parish, Louisiana. After some negotiation, on August 1, 2019, EEI, White Capital, and other working interest owners entered into a Joint Operating Agreement ("J.O.A.") with Key Operating. The J.O.A. covered two plots of land in Plaquemines Parish burdened by two State mineral leases, SL 21187

1

(VUA #1)[1] and SL 18165 (VUA #2).  [Doc. 66-1, p. 5].  Under the J.O.A., White Capital retained a 41.67 percent working interest in the contract area and EEI retained a 7 percent interest.  [Doc. 1, p. 3].  Key Operating served as the project's operator but did not directly own an interest in the mineral leases.  *Id.*

In accordance with the terms of the J.O.A., on May 26, 2020, EEI sent a drilling proposal to the working interest owners to "test" the K-2, K-5, K-6, and P subsurface sands in the VUA #2 mineral lease.  [Doc. 68-1, p. 10].  The estimated drilling cost of EEI's proposed well was $2.5 million.  [Doc. 66-1, p. 6].  Two days later, on May 28, 2020, EEI sent an email to the working interest owners containing a directional drilling plan with an updated P sand target.  [Doc. 71-5, pp. 1-3].  Shortly thereafter, on June 4, 2020, Key Operating submitted an alternative drilling proposal, with a directional plan designated "Design: plan 5" ("Plan 5"), to test the deeper "UVIG" zone as well as the K subsurface sands.  [Doc. 66-1, pp. 6-7].  The estimated cost of Key Operating's drilling proposal was $5.3 million.  [Doc. 66-1, p. 7].

On June 23, 2020, Key Operating's geologist, Jim Gamble ("Gamble"), held a Zoom meeting wherein he shared a PowerPoint presentation entitled "Empire Field K Sands Evaluation for VUA #2 Drill" that explained Key Operating's proposed target intercepts for the K-2, K-5, and K-6 sands.  [Doc. 68-1, p. 11]; [Doc. 68-11, pp. 33-34].

---

[1]     In October of 2019, Key Operating "flowed" the VUA #1 well to test the productive capacity of the well.  [Doc. 68-1, p. 10].  Later, in December of 2019, Key Operating commenced a reworking of the well in an attempt to restore production.  However, the operation was abandoned when it was discovered that the well's tubing had holes from corrosion.  *Id.*  Plaintiff alleges the corrosion was caused by the prior operator's failure to conduct chemical treatments on the well.  Defendants claim Key Operating's "flowing" of the well in October caused the failure.  *Id.*; [Doc. 73, p. 27].

Though not clearly labeled or named in the presentation, the PowerPoint included two well paths: (i) Plan 5, which had been circulated to the working interest owners as part of Key Operating's drilling proposal on June 4, 2020; and (ii) Plan 11, which included a new, refined, intercept for the K-2 sand.  [Doc. 73, p. 7].  Although the working interest owners had not previously seen Plan 11, Gamble emailed the PowerPoint presentation containing both plans to all working interest owners the following day. [Doc. 73-7; pp. 7-9].

Ken White ("White"), the manager of White Capital, planned to vote for EEI's drilling proposal because it cost significantly less than Key Operating's proposal and targeted the more proven K sands rather than the riskier and deeper UVIG zone. [Doc. 73-3, pp. 2, 6].  However, on June 15, 2020, when it became clear that Key Operating's proposal had gathered support from more than 50 percent of the other working interest owners, White called Bill Guidry ("Guidry"), the owner of Key Operating, to discuss the possibility of selling half of White Capital's interest in VUA #2.[2]  [Doc. 68-5, p. 12].  Guidry offered to help White "buy or place" half of his interest in the VUA #2 well and agreed that White Capital would only be required to pay 50 percent of the "cash call" for the Key Operating proposal.[3]  [Doc. 73-3, p. 2].  On June 30, 2020, without any written agreement reducing its interest in the well, White

---

[2]   Together, White Capital and EEI owned approximately 48 percent of the working interest in the VUA #2.  The remaining working interest owners had agreed to support Key Operating's proposal.  *See* [Doc. 73-5, p. 6].

[3]   After their conversation, White emailed Guidry stating that he would support Key Operating's drilling proposal, rather than EEI's, if he could sell half of his interest.  [Doc. 50-5, pp. 25-26].

Capital elected to participate in the Key Operating drilling proposal.  [Doc. 66-1, p. 7].  Shortly thereafter, on July 9, 2020, EEI also elected to participate in Key Operating's drilling proposal.  [Doc. 68-1, p 11].  White Capital and EEI paid 50 percent of the drilling costs attributable to their working interest in the VUA #2 well a few weeks later.[4]  [Doc. 1, pp. 5-6]

Even without a written agreement, Guidry attempted to find a buyer for White's interest in the well.  After numerous potential buyers fell through, Guidry caused MG Energy ("MGE"), a separate company that he owned, to enter into an agreement with White Capital on August 6, 2020.  *See* [Doc. 50-5, pp. 40-41]; [Doc. 50-5, pp. 226-227].  Under the agreement, MGE had the option to purchase a portion of White Capital's interest on or before August 12, 2020.  [Doc. 68-1, p. 12].  Although White Capital executed, notarized, and delivered the agreement, MGE never exercised its option by signing the agreement.  [Doc. 73-3, p. 3].  As a result, the option expired and none of White Capital's interest in the VUA #2 well was sold to MGE or Guidry.  [Doc. 68-1, p. 12].

Key Operating began drilling the VUA #2 well on October 17, 2020.  [Doc. 68-1, p. 11].  Ten days later, on October 27, 2020, the manager of EEI, Chauncey Buck ("Buck"), sent a notice to all the working interest owners that Key Operating was drilling a different well path than the one submitted to them in the June 4, 2020, proposal.  [Doc. 66-1, p. 1]; [Doc. 50-6, pp. 133-134].  Guidry responded to Buck's notice

---

[4]      Both White Capital and EEI would lose their rights in the lease if they did not agree to participate in Key Operating's proposal.  [Doc. 66-1, p. 7].  Accordingly, on August 27, 2020, both White Capital and EEI paid 50 percent of the drilling cost attributable to their percentage working interests in the J.O.A.  [Doc. 1, pp. 5-6].

the next day, stating that they were "on the path of the proposed plan" and included a copy of the proposal and the proposed well path.  [Doc. 50-6, p. 149].  The proposed well path he sent, however, was "Design: rev14" ("Plan 14"), which had not previously been submitted to the working interest owners.[5]  [Doc. 50-6, p. 151].  After receiving Buck's letter, Key Operating continued to drill according to Plan 14.  Subsequently, in November 2020, the well sustained a "blowout" before it had reached its UVIG zone target.  [Doc. 66-1, p. 9]; [Doc. 1, p 7].  Key Operating resigned as operator in May of 2021 and was replaced by Martin Energy, LLC.  [Doc. 68-1, p. 12].  EEI and White Capital have not paid Key Operating the remaining 50 percent of the drilling costs attributable to their respective working interests in the J.O.A.  [Doc. 68-1, p. 12].

## PROCEDURAL HISTORY

On October 8, 2021, Plaintiff filed a COMPLAINT FOR COLLECTION [Doc. 1] against White Capital and EEI alleging that Defendants consented to the VUA #2 well "as-drilled," failed to pay costs associated with Key Operating's drilling of VUA #2, and failed to pay certain expenses related to the previously drilled VUA #1 well. [Doc. 1, pp. 4-5, 7-8].  Defendants filed numerous counterclaims against Key Operating on November 12, 2021, alleging: (i) bad faith breach of contract; (ii) gross negligence and willful misconduct; (iii) fraud; (iv) unfair trade practices; (v) detrimental reliance; and (vi) unjust enrichment.  [Doc. 11].  Additionally, Defendants

---

[5]     The Plan 14 drilling path that was submitted to contractor drilling the well was dated August 10, 2020.  [Doc. 50-6, pp. 128-132].  On July 29, 2020, Buck contacted Key Operating asking for any drill path changes, as well as any new plans related to drilling, the AFE, or casing.  Guidry responded by forwarding a copy of the drilling contracts available at the time, which included Plan 11.  [Doc. 66-10, pp. 54-55].

brought third-party claims against Guidry and MGE alleging: (i) breach of contract, (ii) detrimental reliance, (iii) fraud, (iv) unfair trade practices, and (v) unjust enrichment stemming from Guidry's alleged failure to "buy or place" half of White Capital's interest in the VUA #2.  [Doc. 11, pp. 25-27].

The parties filed the instant Motions on November 18, 2022, upon completion of discovery. [Doc. 66]; [Doc. 68].  In essence, Defendants allege that by drilling Plan 14 rather than Plan 5, Key Operating violated the notice requirement of the J.O.A. and intentionally breached the drilling proposal that all parties had agreed upon. [Doc. 66-1, pp. 12-14].  Plaintiff contends that Defendants consented to the VUA #2 well "as-drilled" and therefore cannot establish that Key Operating violated the notice requirements of the J.O.A.  Alternatively, Plaintiff contends that Defendants cannot establish that Key Operating's actions in drilling Plan 14 constitute gross negligence or willful misconduct that is required for recourse under the J.O.A.'s exculpatory clause.   [Doc. 68]; [Doc. 73]. Plaintiff's Motion further alleges that Defendants' third-party demands against Guidry and MGE – for failing to sell half of White Capital's interest in the VUA #2 – should be dismissed as a matter of law because, among other reasons, there was no written agreement.  [Doc. 68-1, p. 34].

## LAW & ANALYSIS

### I.  Summary Judgment Standard

A court should grant a motion for summary judgment when the pleadings in conjunction with affidavits and documentary evidence, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In applying this standard, the court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th. Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As such, the party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery. *Tubacex, Inc., v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 446 U.S. at 325). There is no genuine issue for trial – and thus a grant of summary judgment is warranted – when the record as a whole "could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   Contractual Claims Under the J.O.A. (VUA #2)

Plaintiff and Defendants both assert that they are entitled to judgment as a matter of law relative to the unpaid drilling costs and expenses corresponding with Defendants' respective shares in the VUA #2 well. [Docs. 66, 68]. Specifically, Defendants argue that Key Operating drilled a different, unapproved well – Plan 14 – without Defendants' consent and in violation of the terms of the J.O.A. [Doc. 66-1, p. 6]. Plaintiff argues that because Plan 14 is merely a refinement of Plan 5,

Defendants had already consented to the well "as-drilled" and that Key Operating therefore complied with the notice requirements of the J.O.A. and is owed the unpaid drilling costs.[6]  [Doc. 68-1, p. 14].  Plaintiff also argues that even if Plan 14 should have been submitted to the working interest owners for approval, its failure to do so does not preclude recovery because of the J.O.A.'s exculpatory clause.

The parties agree that per the terms of the J.O.A., the party submitting a drilling proposal for a "subsequent operation" on the contract area is required to "give written notice of the proposed operation to the parties … specifying the work to be performed, the location, proposed depth, objective zone, and the estimated cost of the operation."  [Doc. 1-2, pp. 8-9].  The parties disagree as to whether the change in the drill path from Plan 5 to Plan 14 is sufficiently material to constitute a different "subsequent operation" under the J.O.A. – thereby requiring new notice – and, if so, whether Key Operating properly notified the Defendants of the change.  The Court addresses these issues in turn.

A. **Key Operating Drilled the Well in a Different Location than Originally Presented to the Working Interest Owners**

The J.O.A. specifies that, "[i]f any party hereto should desire to drill any well in the contract area," they must provide written notice of "five facts" to the other working interest owners: (i) the work to be performed, (ii) the location, (iii) the proposed depth, (iv) the objective zone, and (v) the estimated cost.  The parties do not dispute that these five facts were initially provided by Key Operating to the working

---

[6]     The J.O.A.'s choice-of-law clause states that Louisiana law shall govern. Accordingly, the Court analyzes the claims under Louisiana law. [Doc. 1-2, p. 19].

interest owners on June 4, 2020, in accordance with the terms of the J.O.A. as to the Plan 5 drill path.  At issue is whether Key Operating's revised Plan 14 drill path constituted a change in the well's "location," requiring new notice.

The Louisiana Third Circuit interpreted the same "five facts" of a J.O.A. in *AcadiEnergy, Inc. v. McCord Exploration Co.* 596 So.2d 1334, 1342 (1992). In that case, after the operator had sent a proposal letter for drilling a new well to the working interest owners, one of the working interest owners, AcadiEnergy, notified the operator that it did not want to participate in the well "as is," but would like to participate if the operator changed "the proposed bottomhole location" of the well.  *Id.* Later, AcadiEnergy received a letter informing it that both the bottomhole and surface locations of the proposed well had changed.  *Id.*  AcadiEnergy then requested a plat that showed the new plan but was never sent the requested information.  *Id.* After the well was drilled and completed without AcadiEnergy's participation, AcadiEnergy sued the operator for its interest in the well, claiming the operator failed to properly notify AcadiEnergy of the new well location.  *Id.*  The operator countered that AcadiEnergy was not entitled to any damages because "they drilled to the same objective formation and thus there was no need to make a new proposal" under the J.O.A.  *Id.* at 1342.  In rejecting the operator's argument, the court reasoned that because "AcadiEnergy expressed a desire to participate should [the operator] change the location and AcadiEnergy requested additional information on the proposed well … which they never received," that it did not receive notice of the "five facts" required

under the J.O.A.  The operator therefore failed to properly notify AcadiEnergy of the change in location and comply with the terms of the J.O.A.  *Id.*

Similarly, in *Hamilton v. Texas Oil & Gas Corp.*, the Texas Court of Appeals held that an operator who "moved the original well site and failed to notify [the working interest owner] of the changed location … failed to perform" its duty under the terms of the J.O.A. "to notify the non-operator parties of the drilling of a new well."  648 S.W.2d 316, 323 (1982).  In that case, after the operator submitted a drilling proposal to the working interest owners pursuant to the J.O.A., the operator changed the surface location of the well by 630 feet without notifying the working interest owners or submitting a new drilling proposal.  *Id.* at 319.  The court upheld a jury finding that moving the surface location was a "material change in location. . . [and accordingly] that the duties under the J.O.A. were not performed … in a good and workman like manner." [7]  *Id.* at 323.

Here, it is undisputed that Key Operating submitted Plan 5 to the working interest owners for their approval, but ultimately drilled the Plan 14 well.  To determine whether Key Operating was required to notify the working interest owners of the new drilling path, the Court must look to the changes material to the "locations" of the two plans.  Key Operating asked Jack Stelly ("Stelly"), a land surveyor, to plot Plan 5 and Plan 14 on a plat.  [Doc. 66-9, p. 12].  As requested, Stelly prepared a plot with Plan 5 in green, and Plan 14 in red.  [Doc. 66-9, p. 15].  The plans can be seen below:

---

[7]      The well in *Hamilton* involved a 600-foot change in surface location.



As can be seen on the plat, while Plan 5 and Plan 14 shared the same proposed depth, estimated cost, and objective UVIG zone, their surface locations are 200 feet apart, the P sand depths are different, and the K-2, K-5, and K-6 sand intercept locations are more than 900 feet apart.  [Doc. 66-1, pp. 19-22; Doc. 66-7, pp. 92-94].[8]

---

[8]     There is conflicting expert opinion as to whether the change in surface location alone would be sufficient to constitute a material change in "location" under the terms of the J.O.A. Defendants' expert Louis Gilbert testified that a change in surface location alone would reflect a change in "location" of the well.  [Doc. 66-7, p. 17].  Phil Amy – another of Defendants'

The Court finds these changes are sufficient to constitute a change in "location" under the terms of the J.O.A.  Like *AcadiEnergy,* where the court found that a change in surface location *and* a change in bottomhole location was a material change and thus a change in "location," here the bottomhole location is the *only* aspect of the two drilling paths that did not change between Plan 5 and Plan 14.  Indeed, both the surface location and each of the other target intercepts materially differ between the two plans.

Further, each of the experts retained in this matter acknowledged the materiality of the differences between the two well paths.  Specifically, both Key Operating expert James Veazey and Defendants' expert Phil Amy stated in their depositions that they considered the change in the K sand targets of the respective well paths to be a material change.  Likewise, Defendants' expert Louis Gilbert stated that he considered the change in surface location and different risk profiles between the wells to be material.  Key Operating's geologist, Travis Helms, said he considered Plan 5 and Plan 14 to be "two different well plans."[9] [Veazey p. 88]; [Amy p. 26]; [Gilbert, p. 128]; [Helms pp. 125-26].  As such, the expert deposition testimony in this case is consistent that the changes in surface location, drill path, and K sand intercept

experts – stated in his deposition that a change in surface location would likely not constitute a material change if the well still hit the other proposed targets in the same location.  [Doc. 66-10, pp. 9-10].

[9]    Jim Gamble, Key Operating's non-retained expert, stated that he considered the change of the well path to be "significant … from the original to the new one."  [Doc. 73-9, p. 3].  Additionally, he conceded that he considered the risk profiles between the two plans to be different and that he would want to be notified of the change if he were a working interest owner.  [Gamble pp. 227-228].

targets, taken together, represent a material change in the location of the well.  Thus, to comply with the J.O.A., Key Operating was required to give the working interest owners notice before commencing drilling operations.

**B.  <u>Key Operating Failed to Properly Notify Defendants of the Change in the Location of the Well</u>**

Next, the Court must determine whether Key Operating properly notified the working interest partners of the proposed drilling plan.  Plaintiff argues that it provided proper notice to the working interest owners because, unlike *AcadiEnergy*, where AcadiEnergy requested information and never received it, Defendants received actual notice of the "refinements" in the well path from a PowerPoint presentation that was provided to them on June 23, 2020, before they elected and consented to Key Operating's proposal. [Doc. 68-1, p. 18].  Plaintiff also alleges that it sent the new well-path refinements to EEI in July of 2020, and to White Capital's attorney, David Rusch, in August of 2020.  [Doc. 68, pp. 20-21].

But Key Operating cannot have properly notified Defendants of the changes in location through these notifications, because, among other reasons, Plan 14 *did not even exist* until August 10, 2020.[10]  [Doc. 66-1, p. 8].  Accordingly, there is no genuine dispute of material fact that: (i) the well Key Operating drilled (Plan 14) was in a

---

[10]     Key Operating claims that it properly notified Defendants by sending them Gamble's PowerPoint on June 24, 2020, and emailing Buck on July 29, 2020.  However, neither communication contained Plan 14, the well that was actually drilled.  The referenced PowerPoint contained information relative to Plan 5 and Plan 11 and the email to Buck contained Plan 11.  Plan 11 has both a different surface location and different K-5 and K-6 intercepts from Plan 14.  Thus, like the operator in *Hamilton*, Key Operating failed to provide requisite notice to the working interest owners of the proposed change in location to the VUA #2 well.

different well "location" than originally proposed and presented to the working interest owners; and (ii) Key Operating failed to comply with the notice requirements of the J.O.A. relative to the new location.

### C. <u>The Exculpatory Clause of the J.O.A.</u>

Plaintiff next argues that Defendants' counterclaims against Key Operating should be dismissed because the exculpatory provision of the J.O.A. protects Key Operating from liability.  Article V, Section A of the J.O.A. states that "in no event shall [Key Operating] have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct."  [Doc. 1-2, p. 7].  Key Operating contends that because there is insufficient factual support that its failure to notify Defendants of the change in the well path resulted from gross negligence or willful misconduct, it cannot be held liable.

In Louisiana, gross negligence is defined as the "want of even slight care and diligence" and "the want of diligence which even careless men are accustomed to exercise." *Ambrose v. New Orleans Police Department Ambulance Service*, 639 So.2d 216, 219 (La. 7/5/94) (citations omitted).  "Gross negligence is a label that straddles the divide between intentional and accidental actions." *U.S. ex rel. Administrator of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 554 (5th Cir. 2013).  Willful misconduct is defined as a "voluntary, intentional breach of duty, which may be unlawful, dishonest, or improper, or perhaps all three, that is committed with bad intent or, at best, with wanton disregard for the consequences." *Koonce v. St. Paul Fire & Marine Ins. Co.*, 172 So.3d 1101, 1105 (La. App. 3 Cir. 8/5/15).  The Louisiana

Supreme Court has said that gross negligence and willful misconduct "have tended to merge and take on the same meaning." 723 F.3d 547, 554 (5th Cir. 2013).

In support of claims of willful misconduct and gross negligence, Defendants note that when EEI notified the working interest owners that Key Operating had not drilled according to Plan 5, Guidry responded by sending them the June 4th proposal with a copy of Plan 14, rather than Plan 5, attached to the email and stated: "let me assure you we are exactly on the path of the proposed plan which was approved by all of the partners … [a] copy of the proposal along with the proposed path is attached." [Doc. 50-6, pp. 149-151]. Guidry's message therefore implied that Key Operating was drilling according to the approved Plan 5, rather than the later-developed Plan 14. This, taken with Key Operating's failure to disclose the change in location of the well creates a genuine dispute of material fact as to whether Key Operating's actions constitute gross negligence or willful misconduct.[11] In so finding, the Court denies Plaintiff's Motion seeking dismissal of Defendants' claims under the J.O.A. for breach of contract, gross negligence, and willful misconduct.[12]

---

[11]    Defendants allege that Key Operating's decision to orient the well path to optimize hitting the riskier UVIG target also acted to compromise intercepting the more proven K sand targets in their optimal locations. [Doc. 66-1, p. 9]; *see* [Doc. 66-4, p. 25]. Additionally, while conceding that Key Operating disclosed its ultimate UVIG target to Defendants in the original proposal, Defendants allege that Key Operating failed to disclose a possible motive for targeting the deeper, riskier UVIG target instead of the more proven K sands. Defendants contend that if Key Operating successfully reached the UVIG target, it could unitize a neighboring 2,700-acre tract with Six Pines, another working interest owner in the VUA #2, that held a larger working interest – 67 percent – in the neighboring tract. [Doc. 66, p. 10]; [Doc. 66-3, p. 21]. The result of the unitization would dilute the production interest of the VUA stakeholders, including EEI and White Capital. *Id.*

[12]    To establish a breach of contract claim the party must prove: (i) the existence of a contract; (ii) the party's breach thereof; and (iii) resulting damages. *1100 South Jefferson Davis Parkway, LLC v. Williams*, 165 So.3d 1211, 1216 (La. App. 4 Cir. 5/20/15); *Favrot v.*

### D. **Plaintiff's Claims Under the J.O.A.**

These same factual questions pertaining to whether Key Operating's actions constitute gross negligence or willful misconduct also operate to preclude summary judgment in favor of on Defendants.  In *Chesapeake Operating Inc. v. Sanchez Oil & Gas Group*, a federal court in Texas, applying Louisiana law, held that the non-operator defendant could not "escape the exculpatory clause [of the J.O.A.]" and avoid liability for its share of costs merely by asserting the operator first breached the agreement.  2012 WL 2133554 *3 (S.D. TX, Houston Division, 6/12/12).  In that case, Chesapeake sued a non-operator for drilling costs related to wells drilled in Louisiana pursuant to a J.O.A.  *Id.* at *6.  In response, the defendant asserted various affirmative defenses and alleged that Chesapeake failed to comply with the provisions of the J.O.A. because Chesapeake did not first seek defendant's consent to material changes in the drilling plan.  *Id.*  Chesapeake then filed a motion for summary judgment alleging that the exculpatory provision precluded the defendant from asserting numerous affirmative defenses absent a showing of gross negligence or willful misconduct.  *Id.*  In response, the defendant argued that the exculpatory clause only applied as a defense to an affirmative claim, and did not preclude the defendant from asserting affirmative defenses based on Chesapeake's breach of the J.O.A.  That court rejected the defendant's argument, finding "it essentially seeks to

---

*Favrot*, 68 So.3d 1099, 1108-09 (La. App. 4 Cir. 2/9/11).  If the party is found to have breached the contract in bad faith, they are "liable for all damages, foreseeable or not, that are a direct consequence of [their] failure to perform."  La. Civ. Code Art. 1997.  In finding that a genuine dispute of material fact remains with respect to the application of the exculpatory provision of the J.O.A., the Court also declines to enter summary judgment as to the Defendants' bad faith breach of contract claim.

hold Chesapeake liable because Chesapeake will be left responsible for [the defendant's] share of the operating expenses if the affirmative defenses were to be upheld." *Id.* at *3.

Just as in *Chesapeake*, if the Court were to grant Defendants' Motion, Key Operating would, by default, be responsible for Defendants' share of the drilling costs for the VUA #2 well. Accordingly, the Court finds that Key Operating's alleged breach of the J.O.A. constitutes a defense to Defendants' payment of the remaining drilling costs *only if* Key Operating's actions amount to gross negligence or willful misconduct. Factual questions as to the Key Operating's level of culpability therefore preclude summary judgment on this issue.

### III.   Gross Negligence and Willful Misconduct (VUA #1)

Next, Plaintiff argues Defendants' gross negligence and willful misconduct claims related to VUA #1 should be dismissed because Defendants' claim has prescribed. Defendants claim that Key Operating acted with gross negligence and willful misconduct when they "unnecessarily" flowed over 6,000 barrels of water through the VUA #1 well in October 2019. [Doc. 73, p. 27]; [Doc. 64-3, p. 28]. Key Operating's decision to flow the well, according to Defendants, damaged the well and caused the tubing to corrode – thereby causing loss to the working interest owners. *Id.; see* [Doc. 68-1, p. 10].

Louisiana Civil Code Article 3492 states that "[d]elictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained." Because Defendants allege the damage to VUA #1 occurred in October 2019 yet did not file suit until October 2021, more than one

year had elapsed between the alleged injury and the institution of this action.  The claim has therefore prescribed on its face.  *See Bayou Constr. Grp. v. City of New Orleans*, 2022 WL 17175237 *4 (La. App. 4. Cir. 11/23/22) (holding tortious act prescribed on its face when injury occurred on May 7, 2018, and suit was filed on May 13, 2019); *Geredes v. Estate of Cush*, 953 F.2d 201, 205 (finding negligence claim in tort subject to prescriptive period and thus prescribed).  Plaintiff's Motion is therefore granted as to this claim.

## IV.  **Defendants' Third-Party Breach of Contract Claim**

Plaintiff next argues that Defendants' third-party breach of contract claims against Guidry and MGE should be dismissed as a matter of law because there was no written agreement that Guidry would "buy or place" half of White Capital's working interest in the VUA #2.  [Doc. 68-1, p. 34].  In response, Defendants argue that a written agreement is not required for a binding contract, and in the alternative, that a genuine dispute of material fact remains as to whether Plaintiff ever took ownership of the interest at issue.  [Doc. 73, p. 14].

It is well established in Louisiana that a mineral lease is an incorporeal immovable.  La. R. S. 31:18.  The transfer of an interest in immovable property must generally be in writing.  La. Civ. Code. Art. 1839.  *See Holmes v. Paul*, 279 So.3d 1068, 1073 (La. App. 5 Cir. 10/2/19) (holding oral agreement to extend written contract of sale of property was unenforceable because extension was not in writing); *Lucky v. Carr*, 264 So.3d 693, 693 (La. App. 2 Cir. 1/16/19) (finding without written agreement, oral agreement to purchase and/or sell land was not enforceable); *Hayes v. Gunn*, 115 So.3d 1141, 1146-47 (La. App. 3 Cir. 4/24/13) (noting servient estate owner was not

bound by previous owners oral agreement granting easement to dominant estate owner).  Similarly, to be effective, a promise to transfer an interest in an immovable property at a later time, upon the occurrence of a condition, or upon the performance of some obligation by one of the parties to the contract, must also be in writing.  La. Civ. Code. Art. 2623.  *See Broussard v. Ebare*, 335 So.3d 292, 297 (La. App. 3 Cir. 2/16/22) (holding "[i]n the event a right of first refusal pertains to an immovable … the contract must be in writing").

However, as an exception to the general rule, "an oral transfer [of an immovable] is valid between the parties when the property has been actually delivered *and* the transferor recognizes the transfer when interrogated on oath."  La. Civ. Code. Art. 1839 (emphasis added).  "In order for property to be actually delivered, the immovable which is the object of the verbal sale must have been transferred or placed into the possession of the buyer."  *Harter v. Harter*, 127 So.3d 5, 20 (La. App. 2 Cir. 10/2/13). Thus, for the alleged agreement between White Capital and Bill Guidry to be valid, it must have been: (i) in writing, or (ii) the interest must have been actually delivered to the transferee and transferor must acknowledge the transfer under oath.

Here, Defendants cannot meet their burden because, other than the option contract that lapsed by its own terms, there was no written agreement that Guidry would "buy or place" White Capital's interest in the mineral lease.[13]  Moreover, White

---

[13]   On August 6, 2020, MGE sent an option contract to White Capital to buy between 18 and 22 percent of White Capital's interest in VUA #1 and VUA #2.  [Doc. 1-6, p. 1].  According to the contract: "[c]losing shall occur on or before August 12, 2020.  [MGE] shall have the right, but not the obligation, to close the proposed transaction."  *Id.*  White Capital signed the

Capital's interest was never *actually delivered*.  Ken White and Bill Guidry allegedly had a verbal agreement sometime between June 15, 2020, and June 30, 2020, that Guidry would "buy or place" half of White Capital's working interest in the well.  [Doc. 68-1, p. 35].   Defendants assert that this verbal agreement is binding because "Plaintiffs took ownership of Mr. White's interest."  [Doc. 73, p. 15].  In support of this argument, Defendants rely on numerous email exchanges between Mr. White and Mr. Guidry, as well as Mr. Guidry's deposition testimony.[14]

Defendants also assert that this case is analogous to *Harter v. Harter* where the Louisiana Second Circuit upheld a verbal transfer of mineral leases.  [Doc. 73, p. 15].  This case, however, is clearly distinguishable.  In *Harter v. Harter*, a leaseholder verbally agreed to give two individuals a 25 percent working interest in the lease.  127 20.3d 5, 7 (La. App. 2 Cir. 10/2/13).  The court held that the verbal transfer was valid because the lease holders' internal accounting records, "ownership decks," and other documents showed actual delivery of the interest.  *Id.* at 11.  *See also Thomassee v. Thomassee*, 2015 WL 5547483 *5 (La. App. 1 Cir. 9/21/2015) (finding verbal agreement to sell lot was actually delivered because purchase price was paid and no

---

conveyance, assignment, and bill of sale, but MGE never signed the option.  [Doc. 1-6, p. 10]. Thus, MGE did not exercise its right to purchase the shares, the option lapsed, and no contract was formed.  *See Community Development Capital v. Housing Corporation of America*, 314 So.3d 1045 (La. App. 4 Cir. 2/24/21) (holding that failure to reach an agreement by expiration date provided in letter resulted in termination of offer and thus no contract existed between parties on which a breach of contract claim could be based).

[14]    Though the emails and deposition testimony show that Mr. Guidry was aware of the verbal agreement and even that he took efforts to try to "buy or place" White's shares, the emails and testimony do not show that White's shares were *actually delivered* to Guidry or MGE.  In fact, the "cash call" invoice from September 3, 2020, shows White Capital still retained a 41.67 percent interest in the well.  [Doc. 50-5, p. 255].

evidence was presented that buyer lacked authority to exercise "power and possession of his one-half interest"); *Duhon v. Dugas*, 407 So.2d 1334, 1335 (La. App. 3 Cir. 1981) (holding date of verbal sale of house was date of actual delivery because that was the date the house was transferred and placed in the "power and possession of the buyer."). Here, unlike *Harter*, Guidry never had power or possession over White's interest nor did White ever transfer it to him. White's interest, therefore, was never *actually delivered* to Guidry or MGE.

All told, because White never had a valid written agreement with Guidry to "buy or place" his shares, nor were those shares actually delivered, summary judgment is appropriate as to these claims.

## V.  **Defendants' Fraud Claims**

Plaintiff next seeks dismissal of Defendants' fraud claims related to both the drilling path and Guidry's representation that he would help "buy or place" half of White Capital's interest. Article 1953 of the Louisiana Civil Code states fraud is "a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party, or to cause a loss or inconvenience to another." "For an act to constitute fraud, it must be calculated to produce a misleading effect." *McCoy v. City of Monroe*, 747 So.2d 1234, 1243 (La. App. 2 Cir. 12/8/99). Under Louisiana law, the elements of a fraud claim are therefore: (i) a misrepresentation of material fact, (ii) made with the intent to deceive, and (iii) causing justifiable reliance with resulting injury. *See e.g.*, *D.H. Griffin Wrecking Co., Inc. v. 1031 Canal Dev., LLC,* 463 F. Supp. 3d 713, 725 (E.D. La. 2020).

In *Markiewicz v. Sun Construction, L.L.C.*, the Louisiana First Circuit held that plaintiffs failed to establish a genuine issue of material fact that developer defendants had the intent to deceive plaintiffs into purchasing homes in their subdivision.  343 So.3d 758, 770 (La. App. 1 Cir 6/14/22).  There, the plaintiffs alleged that developer defendants knew their surveys contained false information regarding flooding and intended to deceive plaintiffs into purchasing lots in their subdivision. *Id.* at 760-63.  In dismissing these claims, the court reasoned that because the plaintiffs failed to prove that the defendants knew the surveys presented to plaintiffs were inaccurate when plaintiffs purchased their homes, that there was insufficient evidence of the developers' specific intent to deceive.  *Id.  See also Firefighters' Retirement System v. Grant Thornton, L.L.P.*, 894 F.3d 655, 668 (5th Cir. 2018) (holding plaintiffs failed to show that a defendant auditor failed to act with specific intent to deceive when they "failed to detect and report" proceeds, conflicts of interest, and the value of certain notes in an audit of a fund plaintiffs had invested in).

Conversely, in *Petrohawk Properties*, the Fifth Circuit held that a landman intended to defraud landowners to obtain a lease.  *Id.* at 389.  The court reasoned that because the landman knew she was lying about the validity of the lease, stated she was "willing to say or do anything to obtain it," and told the landowner "don't worry about it, [we have] an office full of lawyers" when he raised legal concerns, that there was sufficient evidence to support a finding that there was an intent to defraud. *Id.* at 389-90.

A. **Drilling Path of VUA #2**

Defendants first allege that Key Operating induced EEI and White Capital to participate in VUA #2 so it could use their funds to test the riskier UVIG formation for its own gain and benefit. However, like *Markiewicz*, Defendants have failed to present sufficient evidence that Key Operating knowingly presented them with false information.[15]  In fact, Plaintiff could not have defrauded Defendants into testing the riskier UVIG formation because Plaintiff was consistent in disclosing the UVIG as its primary target.  Indeed, the UVIG target did not change from Plan 5 to Plan 14, and by their own admission, Defendants were originally hesitant to vote for the Key Operating proposal because of the risks associated with the less-proven UVIG zone.

Far from a fraudulent motive, the evidence suggests instead that Key Operating provided Plan 5 with their initial proposal and later provided Plan 11 because it was "what [they] had at the time."  [Doc. 73, p. 8]; [Doc. 50-5, p. 46]. Further, although Key Operating failed to properly notify Defendants of the changes

---

[15]    Defendants assert that Guidry falsely represented to the working interest owners over email that Key Operating was drilling the plan that the working interest owners had approved when he responded to EEI's letter stating, "we are exactly on the path of the proposed plan which was approved by all of the partners … A copy of the proposal along with the proposed well is attached."  [Doc. 50-6, pp. 149-161].  The email did not contain Plan 5, but rather Plan 14 labeled "Design: rev 14."  *Id.*  Though the Court acknowledges this is misleading, when taken together with the other evidence in the record, it alone is insufficient to show the specific intent to defraud the investors because, among other reasons, there is no evidence that Defendants relied on this email for any material purpose.  EEI was already aware when Guidry sent this email that Key Operating was not drilling according to Plan 5.  [Doc. 50-6, pp. 144-149].  Furthermore, on November 16, 2020, EEI and White Capital informed Key Operating that they would not be paying the cash call invoice because Key Operating drilled Plan 14 rather than Plan 5. [Doc. 50-6, pp. 165-66].  Accordingly, Defendants cannot show that they relied upon or were harmed by this incident.

to the drill path pursuant to the terms of the J.O.A., Defendants offer only raw speculation in support of any fraudulent motive by Key Operating.

In this vein, Key Operating did not need EEI or White Capital's support for the VUA #2 well because Key Operating already had more than 50 percent support from the other working interest owners.  Again, by their own admission, EEI and White Capital would have lost their interest in the lease if they did not participate in Key Operating's proposal.  Key Operating's failure to notify the Defendants of the changes to the well location is therefore insufficient by itself to create genuine disputes of material fact as to intent to defraud.

### B. <u>Verbal Agreement to Help "Buy or Place" White Capital's Interest</u>

Next, White Capital alleges that Guidry fraudulently assured White that he would "buy or place" half of White Capital's interest in the VUA #2 well.  Plaintiff's Motion asserts that, in the absence of evidence that Guidry intended to defraud White, Defendants' claim should be dismissed.  [Doc. 68-1, pp. 37-38].  Here, there is no evidence in the record that Guidry intended to defraud White Capital by orally agreeing he would help "buy or place" half of White's interest.  In fact, the record indicates that Guidry spoke to numerous investors in an attempt to sell White's shares, repeatedly kept White informed of his efforts, and even considered buying White's shares with his other company, MGE.  [Doc. 50-5, pp. 225-229]; [Doc. 50-6, p. 23].

Unlike *Petrohawk*, where the landman knowingly lied, here Guidry clearly made a good-faith effort to help White sell his shares.  Moreover, Key Operating and

Guidry continued the proposed drilling operation despite the fact that White Capital had only paid 50 percent of the drilling costs attributable to White Capital's working interest.  [Doc. 1, p. 6].  Thus, because Defendants are without evidence that Guidry had the specific intent to defraud White, there is no genuine dispute of material fact and Plaintiff's motion for summary judgment on this claim is granted.

## VI.  Louisiana Unfair Trade Practices Act (LUTPA)

In support of its claims under the Louisiana Unfair Trade Practices Act ("LUTPA"), Defendants contend that Key Operating intended to use Defendants' funds from the VUA #2 to test the deeper and riskier UVIG sands for its own benefit. [Doc. 44, p. 23].  Additionally, Defendants claim that Key Operating intentionally misled the working interest owners after EEI notified them of the breach when Guidry replied by attaching Plan 14 and stating that Key Operating was "exactly on the path of the proposed plan which was approved by all of the partners."  [Doc. 50-6, pp. 149-161].

LUTPA proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. Ann. § 51:1405.  To successfully bring a claim under LUTPA, the plaintiff must "prove some element of fraud, misrepresentation, deception or other unethical conduct." *Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994).  "A trade practice is unfair under the statute when it offends established public policy and is immoral, unethical, oppressive, or unscrupulous."  *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. 2000).  What constitutes an "unfair" trade practice is largely left to the discretion of the court. *Turner v. Purina*

*Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993).  The scope of what is considered "unfair" is "extremely narrow." *Pyramid Instrumentation & Electric Corp. v. Herbert*, 2018 WL 1789325 at \*4 (W.D. La. March 14, 2018).  A plaintiff seeking to recover under LUTPA must show that the alleged conduct, "offends established public policy … and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Id.* (quoting *Cheramie Svcs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So.3d 1053, 1059 (La. 2010)).  Importantly, "[t]here is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."  989 F.2d 1419, 1422 (1993).  "[C]onduct that offends established public policy and is unethical is not necessarily a violation under LUTPA."  *Quality Env't Processes, Inc. v. I.P. Petroleum Co.*, 144 So.3d 1011, 1025 (La. 2014) (citing *Chermaine Svcs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So.3d 1053, 1060 (La. 2010)).

Louisiana courts have consistently held that to constitute an unfair or deceptive trade practice, "[a] defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition." *Creative Risk Controls, Inc. v. S.F. Brechtel*, 847 So. 2d 20, 24 (La. App. 5 Cir. 4/29/03) (citing *Nursing Enterprises, Inc. v. Marr*, 719 So.2d 524, 527-8 (La. App. 2 Cir. 8/19/98); *see also Monroe v. McDaniel*, 207 So.3d 1172, 1180 (La. App. 5 Cir. 12/7/16) (holding plaintiff's claim that defendant violated LUTPA by forming a competing business while members of plaintiff's company failed because there was "no evidence that Defendants actions were taken with the specific purpose of harming Plaintiffs."). Here, there is insufficient evidence that Key Operating's actions in drilling Plan 14

rise to the level of egregious behavior delineated in LUTPA. Specifically, as noted above, Defendants do not have evidence establishing that Key Operating intentionally misled them for its own benefit.  Indeed, the Defendants were at all times fully aware of Key Operating's ultimate goal to reach the UVIG zone and neither relied upon nor were harmed by the misleading email from Guidry. Accordingly, summary judgment dismissing Defendants' LUTPA claims is appropriate.

## VII. **Detrimental Reliance**

Plaintiff also seeks summary judgment on Defendants' claims of detrimental reliance stemming from both the altered drilling path and Guidry's representation that he would help "buy or place" half of White Capital's interest.  Detrimental reliance is a doctrine intended "to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." *Luther v. IOM Co. LLC*, 2013-0353, p. 10 (La. 10/15/13); 130 So.3d 817, 825.  Louisiana Civil Code Article 1976 provides, "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying."  A party must therefore prove: (i) "a representation by conduct or word;" (ii) "justifiable reliance;" and (iii) "a change in position to one's detriment because of the reliance." *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 231 (5th Cir. 2018) (quoting *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So.2d 37, 59 (La. 2005)).

A. **Drilling Path of VUA #2**

When a party asserts a claim of detrimental reliance, "they do so because the promise lacked something essential to forming a 'regular' contract." *Masita v. Maumoulides*, 341 So. 3d 11, 24 (La. App. 1 Cir. 11/15/21), *reh'g denied* (Nov. 28, 2021), *reh'g denied* (Nov. 29, 2021), *reh'g denied* (Jan. 11, 2022), writ granted, judgment aff'd in part, rev'd in part sub nom. *Masita v. Maumoulides*, 336 So. 3d 886 (La. 4/26/22), *reh'g denied*, 346 So. 3d 290 (La. 9/20/22). *See also* Jon C. Adcock, *Detrimental Reliance*, 45 LA. L. REV. 753, 769 (1985) (stating "detrimental reliance may be applied in almost any situation in which a contract is invalid or incomplete"). Further, "[i]t is difficult to recover under the theory of detrimental reliance because estoppel is not favored in Louisiana law." *First Louisiana Bank v. Morris & Dickson, Co., LLC*, 55 So. 3d 815, 826 (La. App. 2 Cir. 11/3/10) (citing *Northside Furniture of Ruston, Inc. v. First Tower Loan, Inc.*, 999 So.2d 151 (La. App. 2nd Cir. (12/3/01)).

Here, Defendants' detrimental reliance claims stemming from the altered drilling path are based on allegations that Key Operating failed to comply with the terms of a valid, binding contract between the parties: the J.O.A.  Defendants are therefore entitled to any remedies and damages provided to them under the terms of that contract.  Because: (i) detrimental reliance is generally disfavored in Louisiana, and (ii) the parties' respective rights and obligations are set forth in the J.O.A., the Court finds that the equitable remedy of detrimental reliance is not cognizable under these facts.

### B. Verbal Agreement to Help "Buy or Place" White Capital's Interest

Plaintiff next asserts in its Motion that White Capital's detrimental reliance claim against Guidry and MGE must fail as a matter of law because White's reliance was not justified.  Under the Louisiana law, a party "cannot prevail on a detrimental reliance claim based on an alleged breach of an oral contract to sell immovable property." *John W. Stone Oil Distrib., L.L.C. v. River Oaks Contractors & Devs., Inc.*, 986 So. 2d 103, 108 (La. App. 5 Cir. 5/27/08), *writ denied*, 992 So. 2d 992 (La. 9/26/08) (holding that even if questions of fact remained, plaintiff would be unable to carry his burden at trial because there was insufficient evidence to show a written contract existed to sell an immovable)*; see also Morris v. Friedman*, 663 So.2d,19, 25 (La. 11/27/95) (noting "equity will not lie where a positive legal requirement, not adhered to, exists").  Because Defendants base their detrimental reliance claim on an alleged breach of an oral contract to sell an immovable, their claim fails as a matter of law. Plaintiff's Motion as to this claim is therefore granted.

### VIII.  Unjust Enrichment

Lastly, Plaintiff seeks dismissal of Defendants' unjust enrichment claim related to the funds they paid to Key Operating to drill the VUA #2 well.  [Doc. 44, p. 29].  Louisiana Civil Code article 2298 provides that "one who has been enriched without case at the expense of another person is bound to compensate that person." The phrase "without cause" excludes cases in which enrichment results from a valid juridical act. *Id.*; *see also Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 407 (5th Cir. 2004) ("[O]nly the unjust enrichment

for which there is no justification in law or contract allows equity a role in adjudication.") (quoting *Edwards v. Conforto*, 636 So.2d 901, 907 (La. 1993)). The doctrine of unjust enrichment is therefore not applicable when the law supplies another remedy. *Id.* Thus, to establish a claim for unjust enrichment, a plaintiff must prove: (i) an enrichment; (ii) an impoverishment; (iii) a connection between the enrichment and impoverishment; (iv) lack of a justification or cause for the enrichment and impoverishment; and (v) no other available legal remedy. *Zeising v. Shelton*, 648 F. App'x 434, 437 (5th Cir. 2016) (citing *Pinegrove Elec. Supply Co., Inc. v. Cat Key Const., Inc.*, 11-660, p. 5 (La. App. 5th Cir. 2/28/12); 88 So.3d 1097, 1100).

Here, because Defendants have multiple legal remedies available to them, they cannot satisfy the fifth element.  Defendants' unjust enrichment claim for the VUA #2 well is based on Key Operating's breach of a valid, enforceable contract.  The Fifth Circuit, interpreting Louisiana law, has held that Louisiana law bars claims for unjust enrichment "when the claim is based on a relationship that is controlled by an enforceable contract." *Drs. Bethea, Moustoukas & Weaver LLC*, 376 F.3d at 408 (holding that Louisiana law barred the plaintiff's unjust enrichment claim due to the existence of a valid contract defining the plaintiff's insurance coverage). Accordingly, Plaintiff's Motion is granted as to Defendants' unjust enrichment claim.

## CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 66] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 68] is GRANTED IN PART and DENIED IN PART, as follows:

The Court grants Plaintiff's Motion and DISMISSES WITH PREJUDICE the following claims asserted by Defendants:

1) Gross negligence and willful misconduct related to the VUA #1 well;

2) Third-party breach of contract;

3) Fraud in the drilling of the VUA #2 well;

4) Fraud related to the alleged agreement to sell or place half of White Capital's working interest in the VUA #2 well;

5) Unfair trade practices in the drilling of the VUA #2 well;

6) Unfair trade practices related to the alleged agreement to sell or place half of White Capital's working interest in the VUA #2 well;

7) Detrimental reliance related to the drilling of the VUA #2 well;

8) Detrimental reliance related to the alleged agreement to sell or place half of White Capital's working interest in the VUA #2 well; and

9) Unjust enrichment.

In all other respects, Defendants' Motion is DENIED.

THUS, DONE AND SIGNED in Chambers on this 21st day of January, 2023.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE